# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| **KRISTINE M. STRATTON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **4:09CV3047** |
| | ) | |
| **MICHAEL J. ASTRUE, Commissioner of** | ) | **MEMORANDUM** |
| **the Social Security Administration,** | ) | **AND ORDER** |
| | ) | |
| **Defendant.** | ) | |

   Plaintiff, Kristine M. Stratton, seeks review of a decision by the Commissioner of the Social Security Administration denying her application for supplemental security income (SSI) benefits. After carefully reviewing the administrative record and the parties' written arguments, the court concludes that the Commissioner's decision should be affirmed.

## I.  PROCEDURAL BACKGROUND

   On August 14, 2006, plaintiff filed an application (Tr. 78) for supplemental security income under Title XVI of the Social Security Act, alleging disability beginning January 1, 2006.[1]  The application was denied initially on September 22, 2006 and on reconsideration on December 19, 2006.  (Tr. 47-50).  Plaintiff timely requested a hearing before an Administrative Law Judge (ALJ), alleging disability due to bipolar disorder, post traumatic stress disorder (PTSD), and a closed head injury.  (Tr. 117).  On July 14, 2008, the ALJ held a video hearing at which plaintiff was represented by counsel.  The ALJ issued a decision on July 29, 2008 (Tr. 15-29), finding that the plaintiff was not disabled under § 1614(a)(3)(A) of the Social Security Act.  The Appeals Council denied plaintiff's subsequent request for review on December 31, 2008, and the decision of the ALJ stands as the final decision of the Commissioner.

---

   [1] Plaintiff submitted SSI applications dated August 11, 2004, and July 18, 2005, which were denied at the initial level and not appealed.  (Tr. 15, 39-40, 72-77, 57-60).

## II.  FACTUAL BACKGROUND

Plaintiff, born January 12, 1975, suffered a severe closed head injury in a motorcycle accident on August 10, 1992.  She received SSI benefits from 1993 through approximately 2000-2002; however, the payment of benefits ceased, apparently because plaintiff had excess resources (*see* Tr. 15, 123).

### A.  *Medical Evidence*

In January 2004, plaintiff received treatment at the Douglas County Community Mental Health Center upon referral by the Nebraska Department  of Health and Human Services.  At that time, plaintiff complained of depression and hopelessness and problems sleeping. (Tr. 138).  The pre-treatment assessment completed January 20, 2004 (Tr. 135) reflects that plaintiff's presenting problem was that plaintiff "feels she has bipolar disorder but doesn't really describe well" except for mood swings and trouble sleeping.  Plaintiff advised that she was on SSI for a head injury from 1993 through 2000 and wants back on it now.  The report of a psychiatric evaluation made on January 20, 2004 shows a diagnosis of dysthymia and Cluster B personality disorder traits.  (Tr. 139).

Dr. Gina Oliveto completed a psychiatric examination of the plaintiff on February 29, 2004.  Dr. Oliveto's report (Tr. 123-126) advises that plaintiff was a homeless 29-year-old single white female.  Plaintiff was then living at St. Vincent's Shelter, where she was experiencing symptoms including inconsolable crying spells, poor sleep, low energy, low motivation, anhedonia and depressed mood.  After the 1992 motorcycle accident, plaintiff was in a coma for approximately one month and hospitalized for two months.  Plaintiff has seen psychiatrists off and on since 1992, and did have some outpatient psychiatric therapy after her closed head injury.  She had a cholecystectomy performed in Minnesota in September 2003 and since then has had abdominal cramping and diarrhea. She had spinal meningitis in 2002, for which she was hospitalized in Oklahoma for two weeks.  Plaintiff was approximately five weeks pregnant.

Dr. Oliveto's February 29, 2004 report states that plaintiff was experiencing multiple stressors, including estrangement from her parents and from her eight-year-old daughter.  For the past two years, plaintiff had been traveling by Greyhound bus all over the Midwest, staying with friends and using up the last of her disability money which was discontinued in approximately August 2002.  Plaintiff advised that she returned to Omaha after being raped in Toledo, Ohio in November 2003.  She was hospitalized in Toledo over a period of five days after being raped and was placed on either Zoloft or Prozac; however, she did not stay on the medications because she had taken them in the past and those kinds of medicines had never helped her.

-2-

According to Dr. Oliveto's report, plaintiff had difficulty with the entire February 29, 2004 interview.  She had  poor concentration and attention, and it was obvious that she struggled with memory; however, plaintiff was alert and oriented in all spheres.  Although she described herself as "Really unhappy because my life sucks," she was able to smile and engage in humor at times. Plaintiff's thought content was "notable for focus on wanting to get services for herself, a home for herself, and in general her life back together." Her thought processes were tangential at times, but generally coherent and goal-directed. There was no evidence of suicidal or homicidal ideation and no evidence of any psychoses or formal thought disorder.  Plaintiff appeared to be of at least average intellectual functioning, but her insight and judgment were very poor.  She denied ever having a suicide attempt or engaging in any self-injurious behavior.

Dr. Oliveto's psychiatric diagnosis was "Major depressive disorder. Consider mood disorder as a result of a closed head injury," with a GAF (Global Assessment of Functioning) of 45.

Plaintiff was examined by a psychologist, Rex L. Schmidt, on October 29, 2004 (Tr. 142-151).  At that time, plaintiff was homeless.  She and her infant daughter, born September 20, 2004, had been living in the Vincent House shelter for a month.  Plaintiff understood she was meeting with the psychologist to determine whether or not she was "mental."  She reported receiving Social Security disability benefits from the ages of 17 until 25 due to a head injury she suffered in a motorcycle accident when she was 17 years old.  Plaintiff indicated she was attempting to resume her disability benefits, but her last application for disability was denied.  Dr. Schmidt's report indicates that between 1999 and 2002, plaintiff worked for a grocery store and at least two restaurants, and performed various jobs in the areas of telemarketing and hotel housekeeping.  She said she had to leave a job at McDonalds in 2002 after contracting spinal meningitis.

Dr. Schmidt's report indicates that plaintiff was last psychologically evaluated in February 2004 by Barbara Schuett, M.A. At that time, she was diagnosed with major depressive disorder, recurrent, severe without psychotic features, posttraumatic stress disorder, and a rule out of bipolar disorder. (Tr. 145). Plaintiff reported two psychiatric hospitalizations to Dr. Schmidt: at the Rescue in Ohio, following the November 2003 rape, and at the Spring Center in Omaha in the spring of 2004.  Plaintiff complained of a persistently depressed mood, as well as anhedonia, lethargy, low self-esteem, concentration disturbance, and thoughts of hopelessness. She acknowledged that at times she had thoughts that she would be better off dead, but denied any active suicidal ideation, plan or intent.  She was still experiencing some anxiety symptomatology as a result of the November 2003 rape.  She was not taking any medications; was oriented to person, place, time, and situation; and appeared to have at least an average level of intellectual functioning.  Dr. Schmidt described

-3-

plaintiff's prognosis as "fair" at that time.  Plaintiff did not appear to be as depressed or anxious as she was when she was psychologically evaluated earlier in 2004; however, she did have a severe level of psychosocial stressors due to being homeless and the single mother of an infant.  Plaintiff was performing within the average range of intellectual functioning, had average to high average memory skills, and appeared to have the capacity to manage her own funds.

Plaintiff received a neurological consultation from Edward M. Schima, M.D., on November 4, 2004, at which time her chief complaint was that she had been disabled since she was a child, "but they took me off since I owned property." (Tr. 155).  Dr. Schima noted that the history began at the age of 17 with a motor vehicle accident, resulting in a prolonged coma during a two month hospitalization, followed by difficulties with memory and concentration up to the present time.  Plaintiff also described what may have been an episode of meningitis in 2002, followed by muscle spasms in the thoracic and lumbosacral area.  Dr. Schima reported that plaintiff's neurological examination was completely normal and there was nothing that would indicate that she should be limited in activities such as sitting, standing, lifting, carrying, or handling objects.

On February 1, 2005, plaintiff was seen by psychologist Louise K. Jeffrey at the Nebraska Medical Center/Clarkson Hospital.  The medical records state that her chief complaint was that she wanted to get back on disability.  (Tr. 168).  Plaintiff was described as being reluctant to disclose personal information; she was immature and self focused.  Plaintiff reported that she would like to stay home and be a full time mother.   She was estranged from all of her family of origin.  Her parental rights for her older child were terminated, and the child lived with plaintiff's mother.  Dr. Jeffrey noted that plaintiff denied any "Self-Injury/ Suicidal/ Aggressive/ Homicidal/ Run Away Ideation."  Plaintiff was fully oriented, her thought processes were logical and linear, and  her memory appeared intact.  Although plaintiff thought she might be depressed, she did not complain of tearfulness, sadness, hopelessness, irritability, anhedonia, or apathy in the interview; she did endorse hopelessness and helplessness on the intake form.  Plaintiff's condition appeared adequate for immediate self care needs, although she appeared to be "in poor touch with reality regarding the needs of her child, and [was] seeking a magial externally imposed solution." (Tr. 169).  Plaintiff was referred to Lutheran Family Services for better community based support and would need help with job placement, housing needs, and parenting.  A CPS referral was deferred, as plaintiff currently had resources and the intent to care for her child.

Plaintiff was admitted to Immanuel Medical Center on June 17, 2005 (Tr. 187) after coming to the emergency room complaining that she had been depressed for years, and her depression had

increased over the past 2-3 months with suicidal ideations, but no specific plan. At that time, plaintiff had multiple stressors but no medical complaint.

Following discharge from Immanuel Medical Center inpatient on June 21, 2005, plaintiff received outpatient services through Immanuel Medical Center. The outpatient initial evaluation completed July 25, 2005 by Dr. Padma Lassi reflects that plaintiff was pleasant and cooperative. Dr. Lassi states that plaintiff was diagnosed with bipolar disorder about a year ago. In the past, plaintiff had reported auditory hallucinations and paranoia, feeling that people were out there trying to get her or her daughter. Plaintiff now denied having suicidal/homicidal ideations and denied any paranoia or auditory hallucinations. She did report nightmares, flashbacks, and had a history of rape in November 2003. Dr. Lassi's found no evidence of psychosis, and observed that plaintiff was alert and oriented x3. Her immediate, recent, remote memory was grossly intact, and her insight and judgment were fair. The prognosis was "fair with a follow up of treatment plan that includes therapy and medication management." (Tr. 183).

On July 16, 2006, plaintiff was placed under emergency Protective Custody and hospitalized at Faith Regional Health Services, where she was treated by Dr. Shahbaz Khan. (Tr. 251-253). Medical records indicate that plaintiff's sister called the police because plaintiff was making statements about killing herself. Plaintiff reportedly told the police that she was planning to kill herself by using a box cutter. She was put under a police hold and brought to the Faith Regional Health Services emergency room, where she reported a history of depression and that she was thinking about killing herself and was also thinking about taking pills. Plaintiff reported previous psychiatric admissions and was admitted in Omaha at Alegent in 2005. She used to see a psychiatrist in Omaha, but stopped seeing that psychiatrist because the psychiatrist would not support a claim for Disability. (Tr. 251). Dr. Khan's assessment was: Major depressive disorder, severe, recurrent, without any psychotic features; Rule out bipolar disorder; PTSD; and a GAF (Global Assessment of Functioning) of 30. (Tr. 252).

Plaintiff was transferred to Mary Lanning Memorial Hospital on July 18, 2006, at which time Dr. Dan Bizzell conducted an Emergency Protective Custody/Psychological Evaluation (Tr. 241-246). Dr. Bizzell initially concluded that plaintiff appeared to meet the criteria for being considered both mentally ill and dangerous, with a diagnosis of major depressive disorder and PTSD. She continued to have suicidal ideation, but no specific plans (Tr. 246). Plaintiff was admitted to Mary Lanning for inpatient treatment

Rebecca Simmons, M.D., conducted psychiatric evaluations on July 18, 2006 (Tr. 248), August 10, 2006 (Tr. 224), and August 30, 2006 (Tr. 213). Dr. Simmons' July 18, 2006 report notes that plaintiff wanted included in her treatment plan help to regain her Social Security Disability. The issue was discussed frankly by the plaintiff, who asked Dr. Simmons if she would be willing to help. Dr. Simmons responded that plaintiff's hospital records would be available if she had a lawyer, which she did not. This request did seem to be an important part of plaintiff's treatment plan. The discharge summary completed by Dr. Simmons on July 20, 2006 notes that plaintiff was rather quiet and slowed on admission, "but brightened when she felt that we may refer her to social systems that might improve her financial problems, possibly restart her disability and get her outpatient follow-up." (Tr. 239).

Plaintiff was released on July 20, 2006 to the custody of the Clay County authorities and was transported to her Mental Health Board Hearing. At the Mental Health Board hearing, plaintiff admitted to the charges of being mentally ill and dangerous. She was committed to outpatient therapy and medication management at the Lanning Center in Hastings, Nebraska. (Tr. 237).

Plaintiff was readmitted to Mary Lanning on August 10, 2006 after expressing suicidal ideation during an outpatient session. (Tr. 224). After a lengthy interview by Dr. Simmons, plaintiff was admitted to the Behavioral Services Unit and placed on the treatment program of group and individual therapy with medication management. After the interview, plaintiff immediately went to the day room and asked for some aspirin for her headache. She agreed to begin her treatment by increasing her medication. Dr. Simmons' report states that plaintiff also planned a Social Security Disability interview and wanted social work help with plans for living independently. Plaintiff was discharged to Crossroads on August 18, 2006 with diagnoses of: Depression, major, recurrent with suicidal ideation; PTSD; Borderline personality disorder; and a GAF of 35-40 on discharge. (Tr. 221).

On August 30, 2006, plaintiff telephoned Dr. Simmons from her therapist's office, stating that she had become more depressed over the last two weeks and had begun having suicidal thoughts again. Plaintiff had come to the therapist's office with all of her belongings and was referred for voluntary admission. Upon admission to Mary Lanning, plaintiff was alert and oriented, but depressed. Dr. Simmons' report indicates that plaintiff had not stayed at Crossroads more than 4-6 hours because her family refused to allow her daughter to stay there. The social history taken by Angela Lindeen, LMHP/PLADC, on August 31, 2006 (Tr. 209) indicates that plaintiff left the Crossroads facility, "as there were things there that went against her beliefs. She states that she felt they were going to push Bibles on her and force her to get a job." Lindeen noted that the plaintiff

"voices that she would like to be independent however does not follow recommendations of professionals in an attempt to achieve this goal." (Tr. 210). Plaintiff was discharged on September 1, 2006 with diagnoses of: Major depression, recurrent without psychotic features; PTSD, by history; Borderline personality disorder; and a GAF on discharge of 20-25. (Tr. 205).

On September 6, 2006, plaintiff attended an outpatient evaluation session at the Lanning Center for Behavioral Services. (Tr. 204). Plaintiff was calm and compliant, and was frustrated with her family. She and the therapist, Wendy Piercy, MS, LPC, discussed plaintiff's role and rights as a mother, plaintiff's relationship with her sister, and plaintiff's fears about moving out of her sister's home to a place like Hope Harbor. Plaintiff saw Ms. Piercy on September 14, 2006, advising that she and her family got into a fight and her sister told her to leave. Plaintiff was again calm and compliance. Plaintiff was accepted into the Hope Harbor facility in Grand Island and was discharged from Mary Lanning. The discharge summary dated November 17, 2006 indicates that plaintiff attended therapy as scheduled with one no-show appointment. The focus of treatment initially was stabilization. Plaintiff made the decision that she needed to move out of her sister's house, and she was placed at Hope Harbor. Plaintiff then moved to Grand Island and would be treated at West Anna Mental Health.

On September 21, 2006, Christopher Milne, Ph.D. completed plaintiff's Psychiatric Review Technique (Tr. 262) for Listings 12.04 (Affective Disorders) and 12.06 (Anxiety-Related Disorders), including a Mental Residual Functional Capacity Assessment (RFC) (Tr. 272).[2] As to Listing 12.04, plaintiff was evaluated for disturbance of mood, accompanied by a full or partial manic or depressive syndrome, as evidenced by bipolar syndrome. (Tr. 265). As to Listing 12.06, plaintiff was evaluated for "anxiety as the predominant disturbance or anxiety experienced in the attempt to master symptoms," as evidenced by "recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress." (Tr. 267). Pursuant to Paragraph B of Listings 12.04 and 12.06 (the

---

[2] "Listings" are the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. Under 20 C.F.R. § 416.920a(e), the Commissioner's conclusions must be recorded on a standard form, called the Psychiatric Review Technique Form (PRT). Listing Nos. 12.04 and 12.06 contain paragraph A criteria, paragraph B criteria, and paragraph C criteria. The criteria in paragraph A substantiate medically the presence of a particular mental disorder. The criteria in paragraphs B and C describe impairment-related functional limitations that are incompatible with the ability to do any gainful activity. A claimant will be deemed to meet one of the listed impairments if he or she can satisfy the diagnostic description in the introductory paragraph, the criteria of paragraph A, and the criteria of either paragraph B or paragraph C. 20 C.F.R. Pt. 404, Subpt. P, App.1, § 12.00. *See Hinton v. Astrue*, 2010 WL 3270050 at *11 n.5, Case No. 09-3142 (C.D. Ill. Aug. 17, 2010).

"B" Criteria), Dr. Milne found plaintiff had restriction of activities of daily living; moderate limitation in maintaining social functioning; moderate difficulty in maintaining concentration, persistence, or pace; and one or two episodes of decompensation.  Pursuant to Paragraph C of Listings 12.04 and 12.06 (the "C" Criteria), Dr. Milne found the evidence did not support the presence of the "C" Criteria.

The Mental RFC Assessment (Tr. 272-276) completed by Dr. Milne on September 21, 2006 advises that plaintiff had no marked limitations in any category.  She had moderate limitations in the ability to maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; the ability to work in coordination with or proximity to others without being distracted by them; the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and the ability to interact appropriately with the general public.  She was "not significantly limited" in any of the other categories.  A pretreatment assessment with Dr. Lythgoe on July 28, 2006 showed bipolar disorder, PTSD, and estimated GAF of 50.  A psychiatric discharge summary with Dr. Simmons on July 20, 2006 showed major depression, PTSD, mixed personality disorder and estimated GAF of 35-40.  A psychiatric evaluation with Dr. Khan on July 16, 2006 showed major depression, PTSD, and estimated GAF of 30.  Plaintiff's medically determinable impairments are bipolar disorder and PTSD.  Although a severe condition was present, there was none that met or equaled any listing, considering all subsections under Listings 12.04 and 12.06.  Dr. Milne noted that plaintiff's allegations were partially consistent with the overall pattern of evidence. Although her condition was severe, it was not consistent with any claim of marked psychological limitations.

These findings were affirmed in a PRT completed December 21, 2006 by an agency/DDS consultant (Tr. 277).  The accompanying Residual Physical Functional Capacity Assessment, completed by a medical consultant on December 8, 2006 (Tr. 278), notes that plaintiff was obese and reported headaches for which she did not take any medication.  She reported no limitations in activities of daily living due to physical problems, and her physical impairments were nonsevere.

The record shows that plaintiff had 14 treatment sessions with Janet Duba, RN, RNP, between November 20, 2006 and June 19, 2008.  The corresponding progress notes indicate that plaintiff was kicked out of Hope Harbor by January 2, 2007 and her mother had taken plaintiff's younger daughter (Tr. 290).  On January 11, 2007, plaintiff said she had been thinking about being a truck driver.  She had moved into a new apartment as of the February 20, 2007 session (Tr. 288). On March 29, 2007, plaintiff advised that she had to go to Work Force in order to keep her benefits,

and she had an interview for a babysitting job (Tr. 287). As of April 19, 2007, plaintiff was "working 40+ hours babysitting" (Tr. 286). The following week, plaintiff reported that she had not been sleeping well and talked again about truck driving (Tr. 285). By June 1, 2007, plaintiff had given up her babysitting job; her car was paid for; she was sleeping OK; she was going to talk to HHS and work with voc. rehab.; and she had not been taking her medication. (Tr. 284). The next progress notes are dated October 11, 2007, at which time plaintiff reported that she got back on Medicaid, so was back for a med review. (Tr. 283). On October 25, 2007, plaintiff indicated she was still looking for a job and thought she might be pregnant. (Tr. 282). Apparently, Ms. Duba did not see plaintiff again until January 8, 2008 (Tr. 281), at which time plaintiff said she had worked at Swift for a while but couldn't handle the pressure. She was on Medicaid, and Duba wrote a note prescribing no work for 30 days. Duba's final progress notes, dated June 19, 2008, indicate that plaintiff had been off her medications for two months and said she sometimes gets really depressed; however, she was not suicidal. (Tr. 280).

Virtually all of plaintiff's medical records reflect a diagnosis of obesity.

### B.  Claimant's Testimony

The hearing before the ALJ was held July 14, 2008. (Tr. 310-342).

Plaintiff testified she was then living in an apartment in Grand Island with her three-year-old daughter and her 73-year- old grandmother. Plaintiff was able to drive. She had a high school diploma and could read and write. She had no income except food stamps. An agency was helping her pay for rent and utilities, and the grandmother was helping her pay for gas. At the time of the hearing, plaintiff was 5 feet, 2 inches tall and weighed 270 pounds. (Tr. 315).

Plaintiff testified that she sustained a closed head injury and began receiving supplemental security income in 1993. At that time, the doctors said they did not think she would be able to work, and lawyers helped her get on disability. Her disability was stopped because she bought a piece of property and then had over $2,000 in assets; however, the property became condemned and she could no longer live on it.

Since July 15, 2005, plaintiff had tried working "here and there." In June 2008, she tried working for a delivery company, but hurt her back doing heavy lifting. She went through training at West Corporation for telemarketing, but West did not hire her after the training. She worked at Swift Beef Company in 2002, January 2007, and in February 2008. She stopped working at Swift because she felt she was going to get sick due to the speed of the conveyor belt.

Plaintiff testified she had worked in a corn factory through a temporary agency, Advance Services, Inc.  She stopped working there because she was allergic to a chemical used in the corn husking process and got hives all over her arm.  The facility was not air-conditioned, it was hot, she could not breathe properly, her chest would hurt, and she would have constant headaches due to the heat.  She contacted Advance Services again, but they kept telling her that they didn't have any other type of job for her.

Turning to the babysitting job, plaintiff testified she was with the family for two months at most.  There was one six-month-old child involved.  The family moved out of the city, approximately 30 minutes away, and did not want plaintiff's services any more because they did not want to help her pay for the gas.  In any event, plaintiff testified she was actually on the verge of saying that she couldn't do it anymore because 15 hours a day was too much; she felt she was neglecting her own child.  (Tr. 336-337).

As to her impairments, plaintiff testified that her principal problem was "society."  (Tr. 320-321).  She was not comfortable being around a lot of people.  She felt self-conscious and very anxious.  She could start crying at any given time, and could not control it.  As for sleeping, plaintiff testified, "I don't sleep."  (Tr. 322).  She did not get to bed until three or four o'clock in the morning, but set her alarm for 7:00 so she could provide for her child. A lot of times she did not get back out of bed until between 9:30 and 11:00.

On a typical day, the alarm went off at 7:00 and she would keep hitting the snooze button, finally shut off the alarm, and then sleep for another couple hours.  Then she would get up and make her daughter something to eat.  Then plaintiff would sit on the computer for most of the day, only getting up to make her daughter something to eat.  She would start dinner at about 5:00.  For the most part, plaintiff played computer games. She stated that her daughter was usually pretty close by, playing with her toys or watching TV.  Plaintiff took her daughter outside to play, but not very often.  Plaintiff's grandmother did not require much attention from plaintiff.  (Tr. 325).  The rest of plaintiff's family lived an hour away from Grand Island, and she did not ever see them.  She had acquaintances, but not friends.  She could talk to her neighbors individually, but being around a crowd petrified her.  Plaintiff belonged to a church, but stopped going because she could not afford to put gas in the car and the services were crowded.

Plaintiff testified that she was currently seeing a therapist and receiving counseling.  (Tr. 326).  According to plaintiff, her therapists/counselors are supportive of her and one of them does not feel plaintiff can handle the stress of a job.  (Tr. 327).  When she felt depressed, she would cry

-10-

or would use her computer to disappear.  She did not trust people and tried to avoid them.  She worried that somebody would try to take her daughter away, because her family took her older daughter in 1998.  Plaintiff stated that she had low self-esteem, did not handle changes, was easily distracted, and had trouble completing things she started.  She did her grocery shopping late at night, when the store was basically empty.

Plaintiff had taken medication for her symptoms, but the medication did not help too much; however, she did not note any side effects from the medications.  She did not feel she would be able to work, even after taking her medication, because she felt she could not meet the employer's criteria.  It was too stressful for her to deal with what the employer wanted of her.  She plays many computer games, but said she could only sustain concentration on a task for 30 to 45 minutes.  It would take her a couple days to start focusing again.  (Tr. 331).

### C.    *Vocational Expert's Testimony*

Vocational Expert Jose Chaparro testified that he had reviewed records of plaintiff's work background, noting that plaintiff previously held jobs as a fast food worker at McDonalds (light, unskilled); meat trimmer (medium, unskilled) and hand packager (medium, unskilled) at a packing plant; cashier-checker at the Dollar Store (light, semi-skilled); and child monitor (babysitting; medium, semi-skilled).  (Tr. 335).[3]

Mr. Chaparro was asked to assume a hypothetical claimant between 30-33 years of age, with a high school education, who:  could lift and/or carry 50 pounds occasionally and 25 pounds frequently; could stand, walk or sit at least six hours in an eight-hour workday; should avoid concentrated exposure to airborne pollutants, fumes, odors, and extremes of heat; is limited to simple, one- or two-step job instructions, where dealing with the general public would not be part of the job duties (less than one-third of the day interacting with the public); and who should avoid fast-paced, high-production type work.  (Tr. 337-338).  Based on that hypothetical, Chaparro opined that the only job plaintiff could do would be housekeeping/cleaner.  (Tr. 338).  Chaparro then testified he believed plaintiff could still work as a grocery bagger (Tr. 338), battery stacker (medium,

---

[3] The work history report signed by the plaintiff on September 1, 2006 (Tr. 110-0116) indicates that plaintiff worked as a restaurant cashier from 1994-1995; cashier/stocker at the Dollar Store in 2001; grocery store bagger/checker from August 1999 through May 2000; motel housekeeper in 2001; and meat packer in 2002.

unskilled), and shackler (medium, unskilled), kitchen helper (medium, unskilled).[4]  These jobs were available in significant numbers in the national economy.

Mr. Chaparro was then asked to assume the same hypothetical claimant (but with no relevant work background) who, as a result of bipolar disorder, had poor or no ability to maintain regular attendance and be punctual within customary, usually strict tolerances; complete a normal workday and work week without interruptions from psychologically-based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors; and deal with normal work stress.  (Tr. 340).  Such an individual would be unable to work.  (Tr. 340).  Assuming that in all those areas, the hypothetical claimant's ability was "fair, meaning seriously limited but not precluded" in the areas of ability to understand and remember detailed instructions, setting realistic goals and making plans independently of others, and using judgment and functioning independently, the claimant would not be able to work.  (Tr. 340).

### III.  THE ALJ'S DECISION (Tr. 15-26)

Applying the five-step sequential evaluation process, 20 C.F.R. 404.920(a)(4) (i) - (v), the ALJ found:

**Step 1:**  Plaintiff had not engaged in substantial gainful activity since May 9, 2006, the application date.  Her earnings record showed she has never worked at substantial gainful activity level.

**Step 2:**  Plaintiff had the severe impairment of obesity, and her obesity significantly affected her ability to perform work activities.  The ALJ also found that the symptoms plaintiff experienced while working at the corn factory warranted restrictions against pulmonary irritants and temperature extremes in the work environment.  Since the environmental limitations caused little, if any, interference with work-related activity, those impairments were non-severe.

**Step 3:**  Plaintiff did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listings").  Nor did the claimant's mental impairments, considered singly and in combination, meet or medically equal the criteria of Listings 12.04 or 12.06.  In reaching this conclusion, the ALJ noted that plaintiff was able to care for her small child, maintain her household, and care for her personal

---

[4] Plaintiff later asked to be heard on the matter of housekeeping jobs, stating that she had been let go at the Ramada Inn because she could not clean their rooms fast enough.  (Tr. 341).

needs.  She had no restrictions in her activities of daily living.  Evidence did indicate that plaintiff suffered from occasional paranoia, and the ALJ found she has moderate difficulties in her ability to maintain social functioning. Although the claimant has an average IQ, good memory skills, and appears to have the ability to focus for extended periods of time, as evidenced by her computer activities, there are occasional episodes in which she has problems with attention and concentration. The ALJ found that plaintiff's ability to maintain concentration, persistence, or pace was moderately limited. As for episodes of decompensation, the claimant did experience one to two episodes that required extended hospital stays.

**Step 4:**  Proceeding to Step 4, the ALJ found that plaintiff had the residual functional capacity to lift and carry 50 pounds occasionally and 25 pounds frequently; was able to stand and/or walk for six hours and sit for six hours in an eight-hour workday; must avoid concentrated exposure to pollutants, fumes, odors, and temperature extremes; was able to carry out simple, one- or two-step instructions; was able to work with limited contact with the public at a job that does not require fast-paced, high-production work; and retained the ability to perform all of the other mental functions of work.  The ALJ gave significant weight to the opinion of Dr. Schmidt (*see* Tr. 142), who performed a thorough physical examination of the claimant, plus memory testing, in November 2004.  Also, the neurological consultative examination performed in November 2004 supported the opinion in that Dr. Schima found that the claimant's neurological functioning was completely normal; thus, plaintiff's attempts to regain SSI on the basis of residual organic brain damage from her closed head injury in 1992 had no support in the medical record.

The ALJ provided a thorough discussion of plaintiff's hospital admissions and treatment through the Nebraska Medical Center, Immanuel Medical Center, the Spring Center, Faith Regional Health Services, Mary Lanning, Wendy Piercy, and nurse practitioner Janet Duba, and concluded

> In evaluating the evidence pertaining to the claimant's mental health impairments, the most striking feature is the claimant's persistent efforts to obtain financial benefits. She has had good response to medication, when she chose to be compliant. She showed the ability to work by performing childcare 40 or more hours a week, and was even considering a truck-driving career.  The claimant's repeated failures to follow through with treatment, and her wide range of activities and abilities are inconsistent with an individual who suffers from disabling mental illness.

Tr. 22.

The ALJ found  plaintiff did  have underlying medically determinable physical or mental impairments which could reasonably be expected to produce the alleged symptoms; however,

-13-

plaintiff's statements concerning the intensity, persistence and limiting effects of the symptoms were not credible to the extent they are inconsistent with the RFC assessment.  Nor was the plaintiff's hearing testimony persuasive or convincing:

> She stated she lives in an apartment with her three-year-old daughter and her 73-year-old grandmother and drove herself to the hearing. She stated she recently worked for a delivery company, but could not lift 100 pounds and hurt her back. She said she worked for Swift three different times, but could not work on the conveyor belt. The claimant testified that she is uncomfortable around a lot of people. She said she cannot control crying, and cried on the various jobs because she felt she was not good enough. She stated she gets up late and fixes breakfast for herself and her daughter, then sits at the computer all day until it is time to make dinner. The claimant testified that she plays computer games that take a lot of time. She said she belongs to a church and gets along well with the people there, but has not gone in a couple of months because of gas prices and because there are a lot of people there. She stated she tries to avoid people every day, and only goes out in public when she absolutely has to. The claimant testified that she does not handle change well. and had a difficult time completing things she starts. She stated she is easily distracted, and has problems staying focused. She stated she goes to the grocery store late at night when it is empty. She said she could not work because she cannot meet the employers' criteria. She said she gets behind and stops doing her work because of too much stress. The claimant testified that the longest she can concentrate is 30 to 45 minutes, then cannot do that task again for a couple of days.

Tr. 23.

On the other hand, plaintiff had candidly admitted to Dr. Schmidt that she wanted to resume her SSI and, in February 2005, told psychologist Louise Jeffrey that she wanted to get back on disability.  She told Dr. Jeffrey she had been working for the prior two years and admitted wanting to just stay home and be a full time mother.  Dr. Jeffrey questioned plaintiff's credibility in her statement that she could not remember her childhood at all, when her memory actually appeared to be intact.  In July 2006, plaintiff told a doctor at Faith Regional Health Services that she saw a psychiatrist in Omaha in 2005, but stopped because he would not support her claim for disability.  Plaintiff then told hospital personnel at Mary Lanning that one of her goals when she entered the hospital was to get help resuming her disability.  She was "quiet and slowed on admission but brightened when she felt that we may refer her to social systems that might improve her financial problems [and] possibly restart her disability." (Tr. 239).  Thus, the ALJ questioned the validity of plaintiff's suicidal ideations.  Plaintiff's testimony about her limitations and experiences was not

-14-

consistent with information she gave her doctors and therapists throughout the years, and the ALJ gave very little weight to her subjective complaints.

**Step 5:**  Considering the plaintiff's age, education, work experience, and RFC, the ALJ found there were jobs that exist in significant numbers in the national economy that plaintiff could perform. Based on the testimony of the vocational expert, the ALJ found  plaintiff has been capable of making a successful adjustment to other work that exists in significant numbers in the national economy. A finding of "not disabled" was, therefore, appropriate under the applicable regulations.

## IV.  STANDARD OF REVIEW

The decision of the ALJ, which stands as the final decision of the Commissioner, must be affirmed if there are no errors of law, *see Brown ex rel. Williams v. Barnhart*, 388 F.3d 1150, 1151 (8th Cir. 2004), and it is supported by substantial evidence in the record as a whole, *see Hamilton v. Astrue*, 518 F.3d 607, 610 (8th Cir. 2008).  "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." *Juszczyk v. Astrue*, 542 F.3d 626, 631 (8th Cir. 2008).  The court must consider the entire record, including evidence that supports as well as detracts from the Commissioner's decision.  The court cannot reverse the Commissioner's decision simply because some evidence may support the opposite conclusion. *Hamilton*, 518 F.3d at 610.

## V.  DISCUSSION

The issues presented by the plaintiff are (1) whether the ALJ committed an error of law by failing to find that plaintiff's bipolar disorder and post traumatic stress disorder (PTSD) were severe impairments under the Social Security regulations and rulings, and (2) whether the ALJ committed an error of law by relying on an improper hypothetical question when examining the Vocational Expert.

### A.    The Five-Step Sequential Evaluation Process

Under the Social Security Act, the claimant must prove that he or she is disabled, that is, unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d). The regulations promulgated by the Commissioner of Social Security, *i.e.,* 20 C.F .R. § 416.920(a)(4), establish a five-step sequential evaluation process the ALJ must follow in a disability case. *See, e.g., Robson v. Astrue,* 526 F.3d 389, 391 (8th Cir.2008). The claimant bears the burden of proof in the first four steps.

-15-

Under the Social Security Act, the term "disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d). Further,

> (A) An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

> (B) In determining whether an individual's physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under this section, the Commissioner of Social Security shall consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity. If the Commissioner of Social Security does find a medically severe combination of impairments, the combined impact of the impairments shall be considered throughout the disability determination process.

42 U.S.C. § 423(d)(2).

In deciding whether a claimant is disabled, the ALJ must follow a five-step sequential evaluation process, considering: (1) the claimant's work activity, if any; (2) the medical severity of the impairment; (3) whether the medical severity of the impairment equals one of the listings in Appendix 1 of Chapter III, Part 404, Subpart P; (4) the claimant's residual functional capacity (RFC) and past relevant work; and (5) whether the claimant can perform other jobs in the economy given the claimant's RFC, age, education, and work experience. *See Robson v. Astrue*, 526 F.3d 389 (8th Cir. 2008).

> Step one requires the ALJ to determine whether the claimant is currently engaged in substantial gainful work activity. *See* 20 C.F.R. § 416.920(a)(4)(i), (b). If the claimant is engaged in substantial gainful activity, the ALJ will find that the claimant is not disabled. *See id.* Step two requires the ALJ to determine whether the claimant has a "severe impairment." 20 C.F.R. § 416.920(c). A "severe impairment" is an impairment or a combination of impairments that significantly limits the claimant's ability to do "basic work activities" and satisfies the "duration requirement." *See* 20 C.F.R. § 416.920(a)(4)(ii), (c); *id.* § 416.909 ("Unless your impairment is expected

-16-

to result in death, it must have lasted or must be expected to last for a continuous period of at least 12 months."). Basic work activities include, *inter alia*, "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "[u]nderstanding, carrying out, and remembering simple instructions"; "[u]se of judgment"; "[r]esponding appropriately to supervision, co-workers and usual work situations," and "[d]ealing with changes in a routine work setting." 20 C.F.R. § 416.921(b). If the claimant cannot prove such an impairment, the ALJ will find that she is not disabled. *See* 20 C.F.R. § 416.920(a)(4)(ii), (c). Step three requires the ALJ to compare the claimant's impairment or impairments to a list of impairments. *See* 20 C.F.R. § 416.920(a)(4)(iii), (d). If the claimant has an impairment "that meets or equals one of [the] listings," the analysis ends and the claimant is found to be "disabled." *See* 20 C.F.R. § 416.920(a)(4)(iii). If a claimant does not suffer from a listed impairment or its equivalent, then the analysis proceeds to steps four and five. *See* 20 C.F.R. § 416.920(a). Step four requires the ALJ to consider the claimant's residual functional capacity to determine whether the impairment or impairments prevent the claimant from engaging in "past relevant work." *See* 20 C.F.R. § 416.920(a)(4)(iv), (e), (f). If the claimant is able to perform any past relevant work, the ALJ will find that the claimant is not disabled. *See* 20 C.F.R. § 416.920(a)(4)(iv), (f). Step five requires the ALJ to consider the claimant's residual functional capacity, age, education, and past work experience to determine whether the claimant can do work other than that which he or she has done in the past. *See* 20 C.F.R. § 416.920(a)(4)(v), (g). If the ALJ determines that the claimant cannot do such work, the claimant will be found to be "disabled" at step five. *See id.*

*Walters v. Astrue*, 2010 WL 1292273 at *3, Case No. 4:09-cv-3150 (D. Neb. Mar. 29, 2010) (footnote omitted). Through steps one through four, the claimant has the burden of showing that she is disabled. *Walters*, 2010 WL 1292273 at *4. At step five, however, the burden shifts to the Commissioner to show that there are other jobs in the economy that the claimant can perform. *Id*.

In this case, the ALJ followed the sequential evaluation process set out in 20 C.F.R. § 416.920 and found, at Step 5, that the plaintiff was not disabled.

## B.    Step Two Findings; Bipolar Disorder and PTSD

The ALJ found that plaintiff's only severe impairment was obesity. (Tr. 17). Plaintiff contends the ALJ should have found, at Step 2, that her bipolar disorder and PTSD were also severe impairments.

20 C.F.R. § 416.920(c) requires that the claimant have a severe impairment to be eligible to receive disability benefits: If the claimant does not have any impairment or combination of impairments which significantly limits his or her physical or mental ability to do basic work

-17-

activities, the ALJ must find that the claimant does not have a severe impairment and is, therefore, not disabled.

The criteria for determining the magnitude of the claimant's impairment(s) are found in the Listings, 20 C.F.R. Pt. 404, Subpt. P, App.1.   The listings for mental impairments  generally consist of a set of medical findings that medically substantiate the mental disorder ("Paragraph A criteria"); a set of impairment-related limitations that show effect of the impairment on functions deemed essential to work ("Paragraph B criteria"), and certain additional functional limitations ("Paragraph C criteria").  *Davis v. Astrue*, 545 F. Supp.2d 973, 983-84 (D. Neb. 2008).

The listings implicated in this matter are 12.04 and 12.06.

### 1. Bipolar Disorder; Listing 12.04

Listing 12.04, covering affective disorders, provides that "The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied."

The "A" criteria for Listing 12.04 are:

A.   Medically documented persistence, either continuous or intermittent, of one of the following:
   1.   Depressive syndrome characterized by at least four of the following:
      a.   Anhedonia or pervasive loss of interest in almost all activities; or
      b.   Appetite disturbance with change in weight; or
      c.   Sleep disturbance; or
      d.   Psychomotor agitation or retardation; or
      e.   Decreased energy; or
      f.   Feelings of guilt or worthlessness; or
      g.   Difficulty concentrating or thinking; or
      h.   Thoughts of suicide; or
      i.   Hallucinations, delusions or paranoid thinking; or
   2.   Manic syndrome characterized by at least three of the following:
      a.   Hyperactivity; or
      b.   Pressure of speech; or
      c.   Flight of ideas; or
      d.   Inflated self-esteem; or
      e.   Decreased need for sleep; or
      f.   Easy distractibility; or
      g.   Involvement in activities that have a high probability of painful consequences which are not recognized; or

> h.   Hallucinations, delusions or paranoid thinking;
>
> Or
>
> 3.   Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes)[.]

The "A" Criteria for Listing 12.04 were met, as Section II.C of the PRT dated September 21, 2006 (Tr. 265) does report a finding of "Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes)."

The "B" Criteria for Listing 12.04 are that the applicable "A" Criteria disorders result in at least two of the following:

> 1. Marked restriction of activities of daily living; or
> 2. Marked difficulties in maintaining social functioning; or
> 3. Marked difficulties in maintaining concentration, persistence, or pace; or
> 4. Repeated episodes of decompensation, each of extended duration[.]

In reviewing the record, the court found no record from an "acceptable medical source" documenting marked limitation in any area.  The Mental Residual Functional Capacity Assessment (Tr. 272) dated September 21, 2006 shows no marked limitation in any category.  Thus, the "B" Criteria were not met for listing 12.04.

Since neither the "B" Criteria nor the "C" criteria were met, the ALJ did not commit an error of law by failing to find at Step 2 that plaintiff's bipolar disorder was a severe impairment under Listing 12.04.

### 2.  Post Traumatic Stress Disorder; Listing 12.06

Listing 12.06 governs anxiety disorders, where "anxiety is either the predominant disturbance or it is experienced if the individual attempts to master symptoms; for example, confronting the dreaded object or situation in a phobic disorder or resisting the obsessions or compulsions in obsessive compulsive disorders."  The required level of severity for anxiety disorder is met when the requirements in both A and B are satisfied, or when the requirements in both A and C are satisfied. The "A," "B," and "C" criteria for Listing 12.06 are:

A.   Medically documented findings of at least one of the following:
   1.   Generalized persistent anxiety accompanied by three out of four of the following signs or symptoms:
      a.   Motor tension; or
      b.   Autonomic hyperactivity; or
      c.   Apprehensive expectation; or
      d.   Vigilance and scanning;
   Or
   2.   A persistent irrational fear of a specific object, activity, or situation which results in a compelling desire to avoid the dreaded object, activity, or situation; or
   3.   Recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week; or
   4.   Recurrent obsessions or compulsions which are a source of marked distress; or
   5.   Recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress;
   And
B.   Resulting in at least two of the following:
   1.   Marked restriction of activities of daily living; or
   2.   Marked difficulties in maintaining social functioning; or
   3.   Marked difficulties in maintaining concentration, persistence, or pace; or
   4.   Repeated episodes of decompensation, each of extended duration.
   Or
C.   Resulting in complete inability to function independently outside the area of one's home.

The September 21, 2006 PRT indicates that the "A" criteria were met, as the plaintiff had "recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress." The "B" criteria, however, were not met for Listing 12.06 because the plaintiff did not have marked limitations in any category. As to the "C" criteria, there is no evidence showing that the plaintiff has a "complete inability to function independently" outside the area of her home.

Since neither the "B" Criteria nor the "C" criteria were met, the ALJ did not commit an error of law by failing to find at Step 2 that plaintiff's PTSD was a severe impairment under Listing 12.06. The court finds that the ALJ's findings at Step 2 are supported by substantial evidence in the record as a whole.

### C.   Testimony of Vocational Expert

"'In fashioning an appropriate hypothetical question for a vocational expert, the ALJ is required to include all the claimant's impairments supported by substantial evidence in the record as a whole.'" *Finch v. Astrue*, 547 F.3d 933, 937 (8th Cir. 2008).  In this case, the ALJ posed hypothetical questions to the Vocational Expert, first  asking the VE to assume that the person had the same limitations as set out in the RFC assessment, and then asking the VE to assume that the person had the limitations identified by Janet Duba.  Plaintiff contends that the ALJ committed an error of law by relying on an improper hypothetical question when examining the Vocational Expert, basically arguing that the ALJ should have accepted Ms. Duba's conclusions in their entirety and should not have relied on the findings reported in the RFC.

In this regard, plaintiff relies heavily on the July 8, 2008 Medical Source Statement prepared by nurse practitioner Janet Duba indicating that plaintiff had marked functional limitations in maintaining social functioning and in concentration, persistence or pace (Tr. 298), and no ability or aptitude in five of the 16 "mental abilities and aptitude" needed to do unskilled work (Tr. 300).  Duba also indicated, however, that the plaintiff had a good ability to remember work-like procedures, and an unlimited or very good ability to understand, remember, and carry out very short and simple instructions.  (Tr. 300).

A nurse practitioner is not an acceptable medical source under 20 C.F.R. § 416.913; however, information provided by a nurse practitioner may be considered  to as to the severity of the claimant's impairments and how they affect the claimant's ability to work.  20 C.F.R. § 6.913(d)(1).

Although Janet Duba saw plaintiff 14 times between November 20, 2006 and June 19, 2008, approximately five months[5] had elapsed between the January 8, 2008 appointment and the final contact on June 19, 2008.  Considering this lengthy gap in time, it appeared to the ALJ, that Duba completed the Medical Source Statement as an accommodation to the plaintiff (although there are no treatment notes to that effect), rendering her opinion "less than fully reliable."  (Tr. 22).  The ALJ did give great weight to Ms. Duba's opinion that plaintiff's ability to work at simple jobs was unlimited, because it was consistent with the opinion of the psychological consulting examiner and with the opinion of the state agency medical consultants who reviewed the record.  The ALJ gave less weight to the other limitations set forth in Duba's Medical Source Statement because they were inconsistent with plaintiff's level of

---

[5] Ms. Duba's record of the June 19, 2008 contact states that Duba "hadn't seen her for six months."  (Tr. 280).

functioning and internally inconsistent with Duba's own opinion that plaintiff retains the capacity for simple one and two-step jobs.

The court has determined that the ALJ's findings at Step 2 are supported by substantial evidence in the record as a whole, and plaintiff's bipolar disorder and PTSD are not severe impairments.  Step 5 requires the ALJ to consider the claimant's residual functional capacity, age, education, and past work experience to determine whether the claimant can do work other than that which he or she has done in the past.  Here, the plaintiff did not have any past relevant work experience within the meaning of the applicable regulations.  The Commissioner bears the burden of proof at Step 5 to show that the plaintiff could perform "other work."  The burden may be satisfied through the testimony of a Vocational Expert.  20 C.F.R. § 416.966(e).

In this case, the ALJ did not summarily reject the opinions of Nurse Practitioner Janet Duba, or reject the nurse practitioner's opinions solely because she was not an acceptable medical source; instead the ALJ explained why he found Duba's opinions inconsistent with the medical evidence and with the record as a whole.  Plaintiff's preferred hypothetical question, incorporating all the opinions of Ms. Duba, includes limitations in excess of those supported by the record.  For reasons thoroughly explained in his decision, the ALJ accepted the VE's opinion that plaintiff has been capable of making a successful adjustment to other work that exists in significant numbers in the national economy.  This conclusion is supported by substantial evidence in the record as a whole.

## VI.  DECISION

The plaintiff was given a fair hearing and full administrative consideration in accordance with applicable statutes and regulations. For the reasons discussed above, the court concludes that the Commissioner's decision is supported by substantial evidence in the record as a whole and should be affirmed.  Not every argument advanced by the plaintiff has been discussed in this Memorandum and Order; however, the court has considered all the arguments raised in plaintiff's brief and reply brief and finds them to be without merit.  Accordingly,

**IT IS ORDERED** that the decision of the Commissioner is affirmed, the appeal is denied, and judgment in favor of the defendant will be entered in a separate document.

**DATED October 7, 2010.**

**BY THE COURT:**

**s/ F.A. Gossett, III**
**United States Magistrate Judge**

-22-